1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11

DWIGHT JEFFRIES,

CASE NO. 09cv568-WQH-RBB

12

Plaintiff,

ORDER

vs.

13

ROBERT M. GATES, Secretary of
Defense, Department of Defense,

14

15

Defendant.

HAYES, Judge:

16

The matter before the Court is the "Motion for Summary Judgment Or, in the

17

Alternative, for Partial Summary Judgment" ("Motion for Summary Judgment"), filed by

18

Defendant Robert M. Gates.  (Doc. # 15).

19

**I.      Background**

20

On March 20, 2009, Plaintiff Dwight Jeffries initiated this action by filing a Complaint

21

in this Court.  (Doc. # 1).  Plaintiff, an African-American who is employed by the Department

22

of Defense Commissary Agency ("DeCA"), alleges that his demotion and related incidents

23

were racial discrimination, and his pay reduction was retaliation for filing a complaint with the

24

Equal Employment Opportunity Commission ("EEOC" or "EEO").  The Complaint contains

25

three counts: (1) "disparate treatment based upon race" in violation of Title VII of the Civil

26

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-16; (2) "retaliation for filing EEOC

27

complaint" in violation of Title VII; and (3) "unlawful employment action" in violation of the

28

Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. § 1101.  (*Id*. at 2, 9, 10).

On April 29, 2010, Defendant filed the Motion for Summary Judgment.  (Doc. # 15). Defendant seeks summary judgment as to each of Plaintiff's claims.

On June 21, 2010, Plaintiff filed an opposition to the Motion for Summary Judgment. (Doc. # 17).  Plaintiff also filed objections and requests to strike paragraph 2 of the declaration of Ernani Pacoma, paragraph 17 of the declaration of William Vick, and Defendant's exhibits 12, 13, 14, 19, 32, 37, 39, 42, 43 and 44.  (Doc. # 17-2, 18).

On July 2, 2010, Defendant filed a reply in support of the Motion for Summary Judgment and four supplemental exhibits.  (Doc. # 19).

On July 21, 2010, Plaintiff filed four supplemental exhibits in opposition to the Motion for Summary Judgment.  (Doc. # 22).

On July 25, 2010, Defendant filed a reply brief addressing Plaintiff's four supplemental exhibits.  (Doc. # 24).

On July 26, 2010, the Court conducted oral argument on the pending motions.  (Doc. # 25).

## II.   Facts

Plaintiff has been employed by the DeCA for over thirty years, including twelve years as the Meat Department Manager at the San Diego Naval Base Commissary ("San Diego Commissary" or "Commissary").  (Compl. ¶¶ 4, 8, Doc. # 1).

### A.   "Accountability"

Because commissaries exist not to make a profit, but to sell groceries to service members and their families at low prices, commissaries are subject to tight gain/loss tolerances. According to DeCA directives, a meat department's gains or losses for any month may not exceed 2% of product cost, and "[c]umulative meat account tolerance shall not exceed three-tenths of 1 percent gain with no loss to be considered in compliance."  (Def. Ex. 6 at NOL_181, Doc. 15-4; Def. Ex. 27 at NOL_267-268, Doc. # 15-4; Vick Decl. ¶ 10, Doc. # 15-2; Jeffries Dep. at 34, 238, Def. Ex. 3, Doc. # 15-3).  "A Meat Department Manager is responsible for all operations of the Meat Department," but "[h]is primary responsibility is to ensure that his department operates within accountable tolerance at all times, which is known

1    as 'accountability.'"  (Vick Decl. ¶ 10, Doc. # 15-2).

2         **B.    Plaintiff's History as Meat Department Manager**

3         In 1996, Plaintiff was promoted to Meat Department Manager at the San Diego

4    Commissary, the position he held until his demotion became effective on May 12, 2008.

5    (Jeffries Dep. at 14, Def. Ex. 3, Doc. # 15-3; Def. Ex. 49, Doc. #15-5).  In 1999, Plaintiff was

6    promoted to GS-10, "which made him one of only a handful of meat department managers in

7    the entire 250-plus commissaries world-wide to hold that pay grade."  (Vick Decl. ¶ 13, Doc.

8    # 15-2; Jeffries Dep. at 22, Def. Ex. 3, Doc. # 15-3).

9         During Plaintiff's years as Meat Department Manager, his direct supervisor was Ernani

10   Pacoma, the Perishables Manager.   (Jeffries Dep. at 18-19, Def. Ex. 3, Doc. # 15-3).

11   Beginning several years before Plaintiff's demotion, his second level supervisor was Rubin

12   Barcelona, the Commissary's Administrator.  (*Id.* at 19).  In January 2008, William Vick

13   became the Commissary's Director, and Plaintiff's third level supervisor.  (Vick Decl. ¶ 1,

14   Doc. # 15-2).  Pacoma and Barcelona are Filipino American, and Vick is Caucasian.  Plaintiff

15   alleges that these are the individuals who discriminated against him.  (Def. Ex. 2 at NOL_19,

16   Doc. # 15-3).

17        In November 2003, a "plan of action to correct Meat Department inventory

18   discrepancy" was drafted and distributed to Plaintiff.  (Def. Ex. 13 at NOL_204, Doc. # 15-4).

19   In December 2003, Plaintiff was counseled by Pacoma for being "out of tolerance on monthly

20   inventory."  (Def. Ex. 14 at NOL_206, Doc. # 15-4; Jeffries Dep. at 66-67, Def. Ex. 3, Doc.

21   # 15-3).

22        On June 30, 2005, Pacoma completed Plaintiff's yearly performance review and rated

23   Plaintiff "[o]utstanding: Employee exceeds all of the elements of the performance plan."  (Pl.

24   Ex. 2 at 7, Doc. # 17-3).  Pacoma stated: "Due to Mr. Jeffries['] untiring effort of monitoring

25   meat accountability, Meat department's April 15, 2005 annual inventory resulted in no loss and

26   within DeCA's tolerance level."  (*Id.* at 6).

27        In April 2006, Plaintiff was counseled by Pacoma because the "meat department

28   monthly inventory for the month of January, February and March have revealed that your

department ha[s] had a loss of $7,054.78, $7,037.76 and $7,024.20 respectively for the year [i.e., 2006]. As per DeCA [Directive] 40-3, 'a cumulative gain of .3 of one percent, no loss, is allowed based on the total sales since the last accountability inventory.'" (Def. Ex. 19 at NOL_225, Doc. # 15-4; Jeffries Dep. at 115, Def. Ex. 3, Doc. # 15-3). In April 2006, Pacoma gave Plaintiff a list of six "steps [that] will be taken to improve performance." (Def. Ex. 19 at NOL_226, Doc. # 15-4). On June 30, 2006, Pacoma completed Plaintiff's yearly performance review and rated Plaintiff "[o]utstanding: Employee exceeds all of the elements of the performance plan." (Pl. Ex. 3 at 11, Doc. # 17-3). Pacoma stated: "Mr. Jeffries' active involvement in the daily operation of the meat department has contributed greatly to a successful April 15, 2006 annual inventory gain of .03% which is within the DeCA's tolerance level." (Id. at 10).

Beginning in August 2006, Meat Department was out of either monthly or cumulative tolerance every month until Defendant decided to demote Plaintiff on April 29, 2008. (Def. Ex. 21, Doc. # 15-4; Def. Ex. 22, Doc. # 15-3; Def. Ex. 48, Doc. # 15-5; Ruiz Decl. ¶¶ 2-3, Doc. # 15-2). Beginning in December 2006, the Meat Department had a cumulative loss every month until April 2008. (Def. Ex. 22, Doc. # 15-3).

In April 2007, the San Diego Commissary moved to a new building. (Jeffries Dep. at 223-24, Def. Ex. 3, Doc. # 15-3). "As the largest, most modern and most advanced commissary in the world, the San Diego Commissary is considered DeCA's crowning achievement." (Vick Decl. ¶ 14, Doc. # 15-2; see also Jeffries Dep. at 223-24, Def. Ex. 3, Doc. # 15-3). According to Vick, "[e]xpectations for this commissary are very high." (Vick Decl. ¶ 14, Doc. # 15-2). Jeffries testified that he had never "experienced as much scrutiny as [he] did at the new [commissary]." (Jeffries Dep. at 223-24, Def. Ex. 3, Doc. # 15-3).

A "new computer system" was implemented at the same time the commissary moved to the new building. (Pacoma Dep. at 84, Pl. Ex. 41, Doc. # 17-5). Pacoma received eight hours of training regarding the operation of the new computer system, but Plaintiff received no training. (Id. at 85-86; Jeffries Dep. at 103-04, Pl. Ex. 7, Doc. # 17-3). This computer system "was deployed throughout the Commissaries worldwide in 2007." (Vick Decl., Pl. Ex.

- 4 -

15 at 63, Doc. # 17-3).

In May 2007, Barcelona, the commissary's Administrator, reported in an email to the commissary's then-Director, Oriel Rice, that the meat and produce departments "have big shortages for the end of April." (Def. Ex. 28 at NOL_271). The Produce Manager responded that he did "not have control [of food orders in] my department during the grand opening." (*Id*. at NOL_270). Rice reported this to his boss, Zone 16 Manager Sandy Horan, adding that the meat department probably had sustained a loss too. *Id*. Michelle Frost, the Zone's Chief of Business Operations, responded that the meat department "was in the hole for at least two months prior to the grand opening." *Id.* Rice then sent an e-mail to Plaintiff, Frost, Horan, Pacoma and Barcelona which stated: "Jeff, you stated that you were in the hole prior to grand opening because of the frozen fish promo and the paper work needed to be corrected! Did you get it corrected and what was your final figures! Ms. Frost is right; you should have been in tolerance prior to the grand opening! Tell me what you did to correct it." *Id.*

On June 28, 2007, Plaintiff sent an email to Pacoma which stated:

> One of the reasons for the inventory shortage was the numerous damages and surveys we incurred due to the overstock of merchandise leading to and during the grand opening not to mention samples or demos that we did not get a credit and/or pilferage. Also, a [Government Property Lost or Damaged Survey Certificate] for the amount of $9,896.56 has been submitted ... and is pending approval.

(Def. Ex. 29 at NOL_273, Doc. # 15-4; *see also* Barcelona Dep. at 113, Pl. Ex. 50, Doc. # 17-5 ("new items that were ordered by upper management for the grand opening" created "a lot of salvage," and "when you throw [food] away, that impacts inventory tolerance")). Plaintiff's email then stated a nine-part "plan of action to correct the meat department discrepancy." (Def. Ex. 29 at NOL_273, Doc. # 15-4). Pacoma forwarded Plaintiff's email to Rice, Barcelona and another individual with the message, "[i]nformation submitted as requested." *Id*. The Government Property Lost or Damaged Survey Certificate which was referenced in Plaintiff's June 28, 2007 email states: "On April 18, 2007 at 2:00 P.M. all meat items were marked down 50% on fresh meat in the front display case and beef & pork in the holding box. Received instruction these meat items were not to be transferred over to the new commissary store." (Pl. Ex. 5 at 17, Doc. # 17-3; *see also* Jeffries Dep. at 154, Pl. Ex. 6, Doc. # 17-3

("[T]he commissary didn't have control of its orders until April 21st, 2007.")).  Plaintiff testified that he did not "change anything" as a result of his "plan of action," except that he "[l]ooked at the [daily] sales [report] a little bit more."  (Jeffries Dep. at 164, Def. Ex. 3, Doc. # 15-3).

On July 30, 2007, Pacoma completed Plaintiff's yearly performance review and rated Plaintiff "[e]xcellent: Employee exceeds more than one-half of the critical elements and meets all other elements."  (Pl. Ex. 4 at 15, Doc. # 17-3).  Pacoma found that Plaintiff "[m]et" the performance element, "ensure record of operation within established inventory tolerance," and Plaintiff "[e]xceeded" all other performance elements.  (*Id*. at 14).

On August 20, 2007, the commissary did its annual inventory.  (Jeffries Dep. at 207, Def. Ex. 3, Doc. # 15-3).  As part of the inventory process, "the tolerance accounts were zeroed out and departments started anew for purposes of cumulative tolerances."  (Pacoma Decl. ¶ 9, Doc. # 15-2).  After the tolerance account for the meat department was "zeroed out," the Meat Department lost $11,113.45, or -7.0058%, for the last ten days of August.  (Def. Ex. 21 at NOL_245-246, Doc. # 15-4).

During September 2007, a Commissary supply technician sent an e-mail to Rice which stated:

> After reviewing [Plaintiff]'s receiving procedures, I discovered that they are not following DeCA rules on receiving, they are completing to delivery ticket after the driver is already departed and then completing the paperwork by cop[y]ing the invoice from the company instead of verifying what was delivered[.]  [T]he final invoice is not signed by the meat department or the driver, so this would lead me to believe that the weights of the boxes may not be correct weights that are on the invoice.

(Def. Ex. 32 at NOL_290, Doc. # 15-5).  Rice forwarded this e-mail to Pacoma and Barcelona, stating: "[Pacoma], please investigate this in more detail and get the meat department to follow the proper receiving procedures ASAP!  This explains why the meat department is always out of tolerance!  This must be corrected immediately!"  *Id*.  Pacoma replied that he had discussed the matter with Plaintiff and "instructed him to follow the proper procedure."  *Id*.  Rice replied to Pacoma: "Ernie, you MUST ensure he is following procedures DAILY!  He is in violation of DECA receiving directives and is putting our store in a situation which will require all of

us to face disciplinary action!" *Id*.

In October 2007, "[i]n an effort to assist [Plaintiff] in [his] department," Pacoma "assigned [Plaintiff] an additional employee on a temporary basis to assist [Plaintiff] in timely processing of [Plaintiff's] Meat Department receipts, updating [Plaintiff's] desktop ledger and performing price checks as necessary." (Jeffries Dep. at 256, Def. Ex. 4, Doc. # 15-3).

In November 2007, after Horan was replaced as Zone 16 Manager by Dave Woody, Woody sent an e-mail to Rice, Pacoma, Barcelona, and others which stated:

> San Diego Management team
>
> Take a look at the loss in your meat and produce departments for October. I want an explanation ... tomorrow ... on why these departments are out of tolerance. I don't want excuses I want to know why and how did we get to this point. Folks this is unacceptable and I want action taken. If you cannot get these in tolerance then we will be pulling weekly inventories and disciplinary action could be taken. If this is a true figure I am very disappointed. There is no excuse for this.

(Def. Ex. 33 at NOL_294, Doc. # 15-5). Barcelona replied:

> The grand opening fiasco still lingers in our operations, specifically for meat and produce departments' accountability posture. I am not making this as an excuse but I want to point out that part of this problem is where it started. Also, we have submitted two [Government Property Lost or Damaged Survey Certificate]'s ... to the region ... for the items that we lost on April 18, 2007 for reducing the prices of all meat and produce items due to closure of the old store in preparation for the move to the new store. We still have not gotten approval for these [Government Property Lost or Damaged Survey Certificate]'s. Although these amounts will not cover the departments' shortages, once approved, they will surely help in assessing these ongoing issues.

*Id*. at NOL_293-294. Barcelona proposed three "corrective actions" both departments would take to fix the problem. *Id*. at NOL_294. Woody replied:

> I am still not very happy. There were losses during the grand opening but I know there are more underlying problems. Your meat manager should be checking the front end reports to ensure that all meat items are being rung up under the proper departments. It would not hurt him to go up front and monitor the front end to watch the cashiers and make sure they were ringing items in the right department. If I was meat manager or ... produce manager and my account was this far out of tolerance then I would take it upon myself to conduct more inventories not waiting until the zone manager or deputy store manager told them to. There is defi[nite]ly a trend going on here. The losses are growing and if the excuse is that the grand opening was the cause then common sense would tell me that these should not be growing but it seems like both the meat manager and the produce manager are not concerned and think that their problems are related to the grand opening.
>
> In November if these inventories do not improve then both the [m]eat manager

and the produce manager will be put on Performance Improvement Plan.

*Id.* at NOL_293.  Rice replied:

> You are 100% right!  I have told [Plaintiff] since last August to conduct inventories b[i] weekly or weekly if necessary!  There is no excuse to continue with the losses without performing a weekly inventory!  He must get a hand[le] on this problem!
>
> I know we had problems with the grand opening but we need to move forward in addressing this issue.  Weekly inventories need to be conducted before he [loses] his job!
>
> Mr. Pacoma, please inplement a weekly inventory ... NOW!  If you need help [Barcelona] and I are here, and if you prefer Mr. Woody is always willing to send meat managers to help [Plaintiff]!  This has gone on too long!

*Id.*

On November 20, 2007, Pacoma sent an e-mail to Plaintiff and the Produce Manager, Numenano Reyes, "inform[ing] [them] that effective today ... you will be conducting weekly inventory until your monthly inventory results fall within the DeCA's tolerance level."  (Def. Ex. 34 at NOL_296, Doc. # 15-5).

By the end of November 2007, the Produce Department had reduced its cumulative loss from -2.0192% to -.5463%, and the Meat Department had reduced its cumulative loss from -2.7287% to -1.1058%.  (Def. Exs. 23 & 24, Doc. # 15-4; Def. Ex. 21 at NOL_248-249, Doc. # 15-4).

On December 20, 2007, Pacoma sent Plaintiff a memorandum stating that Plaintiff was being placed on a "Performance Improvement Plan" because Plaintiff's "performance ... is unsatisfactory" in the "critical elements" of "ensur[ing] record of operations remain within established inventory tolerance" and "no more than .3% overage, no loss per month allowed."  (Def. Ex. 36 at NOL_313, Doc. # 15-5).  Pacoma stated:

> The Meat Department has not been within the allowable tolerance (.3% gain no loss) for the last four months of the rating ending November 30, 2007. In an effort to assist you in your department in October 2007 I assigned you an additional employee on a temporary basis to assist you in timely processing of your Meat Department receipts, updating your desk top ledger and performing price checks as necessary.  Currently the Meat Department has a loss of $17,489.92 at a -1.1058%.  As the Meat Manager, when the allowable variance is exceeded, the Meat Manager should take action to review all operational areas and investigate possible causes.  The review should include, but not be limited to the following: review of receiving procedures; pricing of products; possibility of cross-ringing; possibility of employee or patron theft; review of inventory

procedures; review of all accountable documents; ... and excessive salvage being generated.

As discussed previously, weekly price verification is required to ensure accurate pricing is displayed, also ensuring accurate scanning price. Performing weekly price verification is a critical area to ensure a high level of accountability. ...

[Y]ou will be given (60) calendar days during which you will have an opportunity to demonstrate acceptable performance with respect to the above critical element. To be fully successful in this element your monthly tolerance shall not exceed 2 percent plus or minus. I will monitor your performance closely during this period, and at the end of the sixty-day period I will reevaluate your performance and determine whether your performance has reached an acceptable level of competence. If your performance has not reached this level, you will be advised as to whether and when further action will be taken.

*Id.* at NOL_313-314. In an affidavit, Pacoma stated:

By [the] November 2007 deadline for improvement, the commissary produce manager, Numeriano Reyes, had eliminated almost three quarters of his cumulative loss in October, reducing it from -2.0192% to -.5463%. Mr. Jeffries, who had a -2.7287% loss in October, also improved modestly in November, but still had a loss of -1.1058%, which was nearly twice as large as the produce department's. Given the size of Mr. Jeffries' loss, the duration of his accountability problems, the fact that I had previously counseled him at least twice for such problems, the fact that we had already sent in another meat department manager as well as a clerk to help him fix his problems, and my receipt of an order from Zone Manager Dave Woody to place the department managers on Performance Improvement Plans ('PIP') if they did not show sufficient improvement, on December 20, 2007, I placed Mr. Jeffries on a PIP. ... I placed Mr. Reyes on a PIP in February 2008, following his department's January loss of -0.4524.

(Pacoma Decl. ¶¶ 10-11, Doc. # 15-2).

During Plaintiff's "PIP period," Pacoma assisted Plaintiff in "trying to get his accountability issues squared away." (Pacoma Dep. at 224, Pl. Ex. 12, Doc. # 17-3). Pacoma "also assigned an accounting employee to assist [Plaintiff] during [the PIP] time period." (*Id.* at 225-26). Pacoma testified that "four or five times" during the PIP period, he discovered "a problem with accounting of the meat." (*Id.* at 227-28). Specifically, "several times" Plaintiff and one of his subordinates failed to accurately "count the meat" during inventory. *Id.* Pacoma "participate[d] in several of [the] inventories" during Plaintiff's PIP period, although Pacoma "wasn't with [Plaintiff] all of the time." (*Id.* at 229). Pacoma testified that he did not have an explanation for why Plaintiff was still out of tolerance during the PIP period. (*Id.* at 252).

At the end of December 2007, the Meat Department's monthly gain was 2.982%, or 0.982% out of tolerance, with a cumulative loss of -0.0445%. (Def. Ex. 22 at NOL_256, Doc. # 15-4). In December 2007, three of the ten meat departments in Zone 16 were out of tolerance, although Plaintiff's department was the only one to have also been out of tolerance in November 2007. (Pl. Ex. 49 at 299, Doc. # 17-6; *see also* Def. Ex. 55 at NOL_373, Doc. # 19-1 (same)).

In January 2008, Vick replaced Rice as Director of the San Diego Commissary. (Vick Decl. ¶ 1, Doc. # 15-2). On January 13, 2008, Vick sent Plaintiff an email which stated:

> The meat case was a total embarrassment this afternoon. As a matter of fact, this is my fo[u]rth day at SDNB Commissary and your meat department is the worst I have ever seen anywhere in my 20 year career. It is only 1600 and all meat cases are practically empty. You have pork in the back room that needs to be priced and no one is pricing it. There has not been anything to stock all afternoon so I don't have a clue what you[r] staff has been doing all afternoon. I am not going to tolerate this.

(Def. Ex. 37 at NOL_316, Doc. # 15-5).

On January 18, 2008, Pacoma wrote a "mid-year review" for Plaintiff which stated:

> – Monthly inventory shall not exceed 2 percent plus or minus and cumulative shall not exceed three-tenths of 1 percent gain with no loss.
>
> – Timely correction and submission of inspection reports.
>
> – Never-out items must be available at all times during business hours.

(Def. Ex. 38 at NOL_318, Doc. # 15-5). On January 19, 2008, Pacoma issued a "letter of concern" which stated:

> On January 7, 2008, at approximately 1500 hours during a walk through of the Meat Department by Mr. Vick and Mr. Barcelona it was noted that the department was completely out of ground beef. ... [G]round beef is one of the 'Never-Out' items. In addition, at about 1600 on the same day seven more 'Never-Out' items were out and also pork products.
>
> On January 12, 2008, during my periodic check, the Meat Department was out of two 'Never-Out' and one 'Top 20' items. Again, on January 16, 2008, Mr. Vick and Mr. Barcelona found the meat department was out of fresh ground beef.
>
> Mr. Jeffries I have a concern regarding the above. ... Please bear in mind ..., if the above issues continue, I will have no alternative but to take further administrative action.

(Def. Ex. 39 at NOL_320, Doc. # 15-5).

On January 20, 2008, Vick sent an e-mail to Woody which stated:

> The ... meat department is in pathetic condition.  As you are aware the department has run out of ground beef on several occasions in the 2 weeks that I have been here and today at 0730, the case was practically empty after the store opened.  When we reviewed the Meat Department Record of Operations last week, it was evident by the tremendous losses and gains occurring monthly that the inventory is inaccurate.  The spot inventory that Mr. Jeffries submitted last Thursday indicates that he lost another $1700 since the first of the month.  Mr. Jeffries simply does not have a handle on the operation or the inventory.  Due to the size and significance of this department to Zone 16 and DeCA West, we need to take corrective actions ASAP.  I'm afraid the issues are so widespread; it is going to take someone with meat expertise time to straighten things out.  I don't have confidence whatsoever in Mr. Jeffries['] ability to get a grip on things.

(Pl. Ex. 16 at 68, Doc. # 17-3).

During January 2008, Dan Adams, a meat department manager from another store, was brought in to assist Plaintiff.  (Jeffries Dep. at 288-290, Def. Ex. 4, Doc. # 15-3).  In early February 2008, Adams submitted three reports to Vick detailing his "finding[s] in [the] meat dept." (Def. Exs. 42-44, Doc. # 15-5).  Adams' findings included: "meat manager research[ed] his ledger and found double entry on receipts a correction of $27,720.99"; "inventory is still in the negative"; "wrong price[] was found ..."; and "manager special was done wrong." (Def. Ex. 42 at NOL_325-326, Doc. # 15-5).  Adams stated that he offered many suggestions to Plaintiff and his staff.  (Def. Exs. 42-44, Doc. # 15-5).

At the conclusion of January 2008, the Meat Department's monthly loss was -5.6197%, or -3.6197% out of tolerance, with a cumulative loss of -0.9903%.  (Def. Ex. 22 at NOL_256, Doc. # 15-4).  At the conclusion of February 2008, the Meat Department's monthly loss was -2.6335%, or -0.6335% out of tolerance, with a cumulative loss of -1.2417%.  (Def. Ex. 22 at NOL_256, Doc. # 15-4).

On March 25, 2008, Pacoma issued a memorandum to Plaintiff, which provided Plaintiff with "notice that I propose to demote you from your position of Supervisory Commissary Management Specialist (Meat Manager), YC 1144 01, at the San Diego Naval Base Commissary, CA, to the position of Meat Cutter, WG-4714, at the Imperial Beach Commissary, CA." (Def. Ex. 46 at NOL_336, Doc. # 15-5).  The memorandum "charge[d]" Plaintiff with "failure to follow instructions" and contained five "specifications."  (*Id.* at

NOL_336-337).  The first three specifications stated that the Meat Department was out of tolerance during the period of July 2007 through February 2008.  The fourth specification stated that, on February 26, 2008, Plaintiff failed to obey an instruction from the store director "to store meat items in the walk-in cooler after wrapping."  (*Id.* at NOL_337).  The fifth specification stated that, on March 4, 2008, Plaintiff failed to obey the "accepted practice for wrapping and packaging meat."  *Id.*  The memorandum stated that Plaintiff may submit to Barcelona a response to the proposed action within 21 days.  (*Id.* at NOL_338).

Plaintiff responded to the proposed demotion from his home e-mail address.  (Jeffries Dep. at 342, Def. Ex. 4, Doc. # 15-3).  Barcelona testified that he did not recognize Plaintiff's personal e-mail address, and he deletes any e-mail he receives from an unknown address.  (Barcelona Dep. at 241-43, Def. Ex. 53, Doc. # 15-5).

On April 29, 2008, Barcelona gave Plaintiff a memorandum stating that Barcelona had decided to demote Plaintiff "from [his] position as Meat Department Manager, GS-1144-10, at San Diego Naval Base, to the position of Meat Cutter WG-7407-07 at the Imperial Beach Commissary for the following charges: Failure to follow directions."  (Def. Ex. 48 at NOL_340, Doc. # 15-5).  At the time Barcelona gave this memorandum to Plaintiff, Plaintiff asked Barcelona if he had read Plaintiff's response to the proposed demotion.  (Barcelona Dep. at 241-42, Def. Ex. 53, Doc. # 15-5).  Barcelona said he had not, and Plaintiff gave Barcelona a hard copy of his response to the proposed demotion.  (*Id.* at 242).  Barcelona showed the response to Vick, who told Barcelona, "I'm not honoring that statement."  (*Id.* at 243).  On May 2, 2008, Barcelona issued an amended memorandum, wherein Barcelona stated: "I have reviewed [Plaintiff's] response, and find that the contents do not change the facts or alter the outcome."  (Def. Ex. 49 at NOL_342, Doc. # 15-5).  The amended memorandum stated that "May 10, 2008 will be your last day as the Meat Department Manager at the San Diego Naval Base Commissary."  *Id.*  Barcelona testified that "the only reason" Plaintiff was demoted "was that the meat department was not within appropriate inventory tolerance."  (Barcelona Dep. at 173, Pl. Ex. 53, Doc. # 17-5).  Barcelona testified that Vick was "the ultimate deciding authority" on whether to demote Plaintiff, and Vick told Barcelona, "I need you to issue the

letter [demoting Plaintiff]." (Barcelona Dep. at 90, Pl. Ex. 54, Doc. # 17-6). Barcelona testified that he "d[id]n't know" whether he wanted to demote Plaintiff, but he was "ordered to do so, and that's what [he] did." (*Id*. at 239).

Vick, Pacoma and Barcelona testified that they assumed that someone in human resources would have considered the *Douglas* factors in finalizing Plaintiff's demotion and transfer.[1] (Vick Dep. at 318, Pl. Ex. 25, Doc. # 17-4; Pacoma Dep. at 275, Pl. Ex. 45, Doc. # 17-5; Barcelona Dep. at 251-52, Pl. Ex. 46, Doc. # 17-6). DeCA human resources representative Jacquelyn Deaser testified that she "consider[s]" and "review[s] the *Douglas* factors [her]self," and she "talked about ... the items in the *Douglas* factors" "with [people in] San Diego with regard to Mr. Jeffries," but she did not "go over the *Douglas* factors with them." (Deaser Dep. at 138, Pl. Ex. 47, Doc. # 17-6).

On May 8, 2008, Plaintiff initiated a complaint with the DeCA EEO office, alleging racial discrimination. (Pl. Ex. 27 at 142, Doc. # 17-4). On May 9, 2008, Vick received an e-mail from an EEO counselor regarding Plaintiff's charge of discrimination. (Pl. Ex. 17 at 70, Doc. # 17-3). Vick forwarded the e-mail to Woody and stated, "This was bound to happen." *Id.* Woody replied to Vick, "No worries we knew he would do this." *Id.*

On May 9, 2008, Vick issued a "memorandum of correction," which stated:

> The purpose of this memorandum is to provide corrected information in regards to our accountable inventory conducted on April 30, 2008. ...
>
> Transfer sales amount of $24,591.11 from Grocery Department to Meat Department. ... Pork Mini Ribs have been scanning to Grocery Department.... Reduce meat inventory by $11,845.60. These items were received on May 1, 2008 (after inventory) and were included in the inventory on April 30, 2008.
>
> With the transfer of $24,591.11 to the Meat Department, our Meat Department book inventory will read $75,475.23. With the reduction of $11,845.60 in Meat Department, our modified Meat Physical Inventory will read $80,952.63 with a gain of $5,477.40 (.011%).

(Pl. Ex. 1 at 2, Doc. # 17-3). Woody testified that Vick did not inform him about the May 9, 2008 memorandum of correction, nor was he aware of "a glitch in the computer system."

---

[1] "In *Douglas* [*v. Veterans Admin.*, 5 M.S.P.R. 280, 305-06 (1981)] the [Merit Systems Protection] board articulated twelve factors that may be considered in determining the appropriate sanction for a particular offense." *McClaskey v. U.S. Dep't of Energy*, 720 F.2d 583, 587 (9th Cir. 1983).

(Woody Dep. at 119-22, Pl. Ex. 44, Doc. # 17-5).  Woody testified that he was not informed that the Meat Department was in cumulative tolerance on the day Plaintiff was demoted or that a "loss ... was suffered when [DeCA] moved from the old store to the new store." (*Id*. at 146; *see also id*. at 117-18, 121-23, 125).  Woody testified that the $24,591.11 "memorandum of correction" and the fact that the Meat Department was in cumulative tolerance on the day Plaintiff was demoted "should have been taken into consideration" prior to implementing discipline.  (*Id*. at 126).

Pacoma testified that "we found that the baby back ribs [were] scanning to grocery" in the amount of $24,591.11, and he had no knowledge of any other instances of money being credited to the Meat Department from another department.  (Pacoma Dep. at 94-95, Def. Ex. 56, Doc. # 19-1; *see also id*. at 75).[2]  Pacoma testified that he "was checking some meat products, ... [he] noticed an item that was mislabeled.  Instead of having a meat label, it had a grocery label on it." (Pacoma Dep. at 74-75, Pl. Ex. 9, Doc. # 17-3).  The mislabeled item was "Tyson baby back ribs" and the mislabeling was done by "an outside third party ... vendor stocker."  (Pacoma Dep. at 75, Def. Ex. 56, Doc. # 19-1).  Pacoma testified:

> The label was grocery versus meat.  And you can just eyeball that, because you can see it.  It says [']grocery['] on the label. ...  And if you see that ... you know for sure that that item will go to that department.  And I know that that item is supposed to be meat department, so I know there is a mistake there. ...  [T]he issue ... was that the vendor stocker put [on] the wrong label.  He did not use the meat label.

(Pacoma Dep. at 233, 236, Def. Ex. 57, Doc. # 19-1).

Barcelona testified that he was not aware of any "glitch" or "problem" with "the computer system at the commissary."  (Barcelona Dep. at 73, Pl. Ex. 42, Doc. #17-5).  The clerk assigned to assist Plaintiff, Emelina Daplas, stated that the "computer problem" was that when certain items of meat were scanned at the cash register, the register "would say 'enter amount' and that's it.  Then the Cashier would have to enter the price of the meat and the

---

[2] Portions of Pacoma's deposition, Defendant Exhibits 56 and 57, contain handwritten changes.  Defendant asserts that "Pacoma corrected" the transcript, and Plaintiff has not disputed this assertion.  (Doc. # 19 at 5 n.3).

department." (Pl. Ex. 14 at 58, Doc. # 17-3).[3]  Vick stated in an affidavit that the computer system used in the San Diego Commissary "was deployed throughout the Commissaries worldwide in 2007" and that "other departments" using the same system "were identifying issues and correcting them so it would not jeopardize their accounts to be out of tolerance on an ongoing basis." (Vick Decl., Pl. Ex. 15 at 63, Doc. # 17-3).

Plaintiff was demoted effective May 11, 2008. (Def. Ex. 52, Doc. # 15-5). The paperwork for Plaintiff's demotion and resulting pay reduction was initiated on May 15, 2008 and completed on June 4, 2008. (Def. Ex. 51, Doc. # 15-5). On May 16, 2008, Vick sent an e-mail to the "North Island Store Dir[ector]" which stated: "I know you don't want or need Mr. Jeffries on your payroll but due to the sensitivity of the situation, we really need to make sure everything is done timely. Mr. Jeffries will probably file with the EEO or [Merit Systems Protection Board] and we need to make sure everything is as tight as possible." (Pl. Ex. 18 at 72, Doc. # 17-3).

Plaintiff testified that at the time Barcelona informed Plaintiff that he was being demoted, Barcelona said, "You don't have anything to worry about. You should be getting your same salary." (Jeffries Dep. at 327-28, Pl. Ex. 30, Doc. # 17-4). Woody testified that, at the time of Plaintiff's demotion, Deaser told him that the demotion and "transfer would not result in a pay cut to Mr. Jeffries." (Woody Dep. at 130, Pl. Ex. 51, Doc. # 17-6). On June 26, 2008, Vick sent an e-mail to Woody and Deaser indicating that he had received a phone call from Plaintiff's wife "inquiring about the reduction in Mr. Jeffries['] salary." (Pl. Ex. 28 at 146, Doc. # 17-4). Vick asked if Plaintiff's "salary was reduced to Meatcutter pay." *Id.* Woody responded, "It was my understanding that this reassignment would not result in a loss of pay. ... [Deaser,] [p]lease help us check into this...." *Id.* Deaser responded: "Mr. Jeffries['] salary would have been set to a meat cutter. This was a disciplinary action, so he was not entitled to retain pay." (Pl. Ex. 37 at 229, Doc. # 17-5). On August 30, 2008, the Defense Finance and Accounting Service sent Plaintiff a letter requesting $782.99 in wage

---

[3]  Daplas' declaration is not signed, but Defendant does not object to it. Accordingly, it will be considered by the Court.

1  "overpayment [a]s a result of a Personnel change."  (Pl. Ex. 29 at 148, Doc. # 17-4).

2       After Plaintiff's demotion, Pacoma acted as interim Meat Manager.  (Pacoma Dep. at

3  65, Pl. Ex. 40, Doc. # 17-4).  Pacoma testified that "Mr. Epps," who is African American and

4  had been the "Lead Meat Cutter" at the San Diego Commissary since approximately 1998, did

5  a "good job."  (*Id.* at 49-50, 63-64).  Vick stated that the new San Diego Commissary Meat

6  Manager is Caucasian, and was a DeCA Meat Manager at the Bangor, Washington

7  Commissary.  (Vick Decl., Pl. Ex. 15 at 65, Doc. # 17-3).

8       Plaintiff stated in an affidavit:

9       Numerous departments in Zone 16 stores have experienced chronic inventory
        variations.  This has been, and continues to be an issue in all stores. ...  [I]n my
10      34 years with DeCA, I have never seen or heard of any other manager ever being
        demoted.  I also have never heard of any other manager ... even being
11      disciplined at all for inventory variance.

12  (Jeffries Decl. ¶¶ 3-4, Pl. Ex. 23, Doc. # 17-4).  Plaintiff testified that he did not believe that

13  either the San Diego Commissary Produce Manager or the Grocery Manager "was out of

14  tolerance cumulatively to as great a percentage as [Plaintiff] w[as]," but Plaintiff believed the

15  Produce Manager "was out of monthly tolerance to as great a percentage as [Plaintiff] w[as]."

16  (Jeffries Dep. at 399, Def. Ex. 4, Doc. # 15-3).

17       Woody testified that "a lot of stores have inventory variations," but to his knowledge,

18  the only person who has been "disciplined ... for inventory variation" is Plaintiff.  (Woody

19  Dep. at 165-66, Pl. Ex. 22, Doc. # 17-3).  Barcelona testified that, in his experience, Plaintiff

20  "was the only management person who [has] ever been demoted because of being out of

21  tolerance."  (Barcelona Dep. at 148, Pl. Ex. 52, Doc. # 17-6).  Reyes, the Produce Manager at

22  the San Diego Commissary, stated that "this is the first time I have ever heard of the Manager

23  [being] demoted."  (Reyes Decl., Pl. Ex. 38 at 232, Doc. # 17-5).[4]

24       Vick stated in an affidavit: "Before Mr. Jeffries' demotion, I had demoted two other

25  department managers for management deficiencies, including accountability problems.  Both

26  of those managers were Caucasians."  (Vick Decl. ¶ 15, Doc. # 15-2).  Vick testified that in

27

28       [4] Reyes' declaration is not signed, but Defendant does not object to it.  Accordingly,
    it will be considered by the Court.

1    late-2008 or early 2009, he hired an African-American employee at the San Diego Commissary

2    for the position of Supervisor Store Associate.  (Vick Dep. at 106-07, Def. Ex. 58, Doc. # 19-

3    1).  Vick had previously worked with this employee at the Camp Pendleton Commissary, and

4    his new position at the San Diego Commissary constituted a promotion.  *Id.*

5    **III.    Contentions of the Parties**

6             With respect to Plaintiff's Title VII discrimination claims, Defendant contends:

7    "Plaintiff cannot establish discriminatory animus" or "a prima facie case of discrimination"

8    (Doc. # 15-1 at 14-15); "Plaintiff identifies no similarly situated employee who was treated

9    better" (Doc. # 19 at 2); and Defendant's legitimate nondiscriminatory reason for demoting

10   Plaintiff was that, "despite repeated warnings, chances, and efforts to assist Plaintiff, he was

11   simply not able to successfully perform his duties–and his department had lost money for well

12   over a year" (Doc. # 15-1 at 16-17).  Defendant also contends: "Plaintiff failed to timely

13   exhaust his EEO administrative remedies for discrete acts occurring before March 21, 2008,"

14   including "the December 2007 PIP (which ended in February 2008) and the January 2008

15   Letter of Concern" (*id.* at 12); and the "December 2007 PIP, January 2008 Letter of Concern,

16   and March 2008 Proposed Demotion Letter" "are not sufficiently adverse ... [to] support[] an

17   actionable adverse action claim under Title VII" (*id.* at 13).  With respect to Plaintiff's Title VII

18   claim that his pay was cut in retaliation for his EEO activity, Defendant contends: "Plaintiff

19   has no evidence that anyone involved in processing his demotion even knew of his EEO

20   activity" (*id.* at 17); "a DeCA employee like Plaintiff who is demoted for performance or

21   disciplinary reasons is not entitled to ... save pay"; and Plaintiff "has no evidence that the

22   reduction had any connection with either his EEO activity or his race" (*id.* at 18).  Finally,

23   Defendant contends that "this Court lacks jurisdiction over Plaintiff's CSRA claim" because

24   "Plaintiff has waived his CSRA claim by bypassing the [Merit Systems Protection Board] in

25   favor of the district court."  (*Id.* at 19, 25).

26             Plaintiff contends that he "was wrongfully demoted from his long term managerial

27   position based on pretext, innuendo and in violation of agency policies, procedures and

28   guidelines."  (Doc. # 17 at 1).  Plaintiff contends that he has offered the following "specific

and substantial direct and indirect evidence of racial animus":

> (1) Only manager who is African-American, who was disciplined for inventory variation, in zone manager Woody's 22-year career and in Jeffries['] 32-year career and in produce manager Reyes' career; (2) Inventory variation was an illusion known to Vick, who corrected the books one day after Plaintiff's demotion; (3) Complete and total disregard of DeCA regulations and guidelines in implementing Plaintiff's discipline; (4) Discipline far exceeds internal DeCA rules; (5) Complete failure to consider *Douglas* factors; (6) Testimony of Kathy Hodges-Shaw that Vick was discriminating; (7) New meat manager is Caucasian; (8) No African American managers at the San Diego Commissary since Plaintiff transferred.

(*Id.* at 12 (citations omitted)).  With respect to his retaliation claim, Plaintiff contends:

> The Plaintiff ... has proffered substantial evidence to the effect that a wrongful motive was more likely than not a motivating factor in the action.  In this regard, Plaintiff was told, on several occasions, by multiple managers that he would have 'safe pay,' despite demotion. ...  He did, in fact, receive safe pay through August, 2008 when his pay was retroactively cut.  Additionally, DeCA sought reimbursement.

(*Id.* at 14).  With respect to Defendant's contention that the Court lacks jurisdiction over Plaintiff's CSRA claim, Plaintiff contends that, "[a]lthough there is no relevant Ninth Circuit authority, all of the applicable case law in every circuit that has considered the issue unanimously supports the Plaintiff's position that this Court has jurisdiction over the non-discrimination claims in a 'mixed case' complaint"; and "Defendant's counsel is estopped from arguing a requirement to resort to the [Merit Systems Protection Board] first, contrary to his client's own longstanding interpretation and written, detailed instruction to Plaintiff and other claimants allowing filing directly with the District Court."  (*Id.* at 15, 23).

## IV.   Discussion

### A.   Standard of Review

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  A fact is "material" if it may affect the outcome of the case.  *See id.* at 248.  The party moving for summary judgment bears the initial burden of

identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own evidence, "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

### B.   Title VII Discrimination Claims

Under Title VII, an employer may not "discriminate against an individual with respect to his ... terms, conditions, or privileges of employment" because of his race. 42 U.S.C. § 2000e-2(a). "This provision makes 'disparate treatment' based on race a violation of federal law." *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 658 (9th Cir. 2002). "In responding to a summary judgment motion in a Title VII disparate treatment case, a plaintiff may produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant's decision, or alternatively may establish a prima facie case under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005) (citation omitted).

### 1.   *McDonnell Douglas*[5]

"Under *McDonnell Douglas*, a plaintiff alleging disparate treatment under Title VII must first establish a prima facie case of discrimination. Specifically, the plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject

---

[5] Plaintiff relies upon caselaw applying the *McDonnell Douglas* framework and caselaw applying a "mixed motive" framework. *See* Doc. # 17 at 7-8 (citing *Dominguez-Curry* (*McDonnell Douglas* framework) and *Desert Palace v. Costa*, 539 U.S. 90 (2003) ("mixed motive" framework)). The Court applies the *McDonnell Douglas* framework.

to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably." *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116, 1123 (9th Cir. 2009) (quotation omitted). "At summary judgment, the degree of proof necessary to establish a prima facie case is minimal and does not even need to rise to the level of a preponderance of the evidence." *Dominguez-Curry*, 424 F.3d at 1037 (quotation omitted). "If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision. ...  If the employer offers a nondiscriminatory reason, the burden returns to the plaintiff to show that the articulated reason is a pretext for discrimination." *Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 804).

### a.    Prima Facie Case

It is undisputed that the first two elements of the prima facie case are satisfied:  Plaintiff belongs to a protected class, and he was qualified for the position of Meat Manager.  It is also undisputed that Plaintiff's demotion constitutes an adverse employment action.[6]  The parties dispute whether Plaintiff has produced evidence that similarly situated individuals outside Plaintiff's protected class were treated more favorably.

Plaintiff has produced evidence that Reyes, the San Diego Commissary Produce Manager, was out of tolerance repeatedly.  For the twelve months between February 2007 and January 2008, the Produce Department was out of cumulative and monthly tolerance every month, losing money each month.  (Pl. Ex. 58 at 346, Doc. # 22-2; Pl. Ex. 59 at 354, Doc. # 22-2).  During five of these months, the Produce Department's losses exceeded the losses of the Meat Department.  (Pl. Ex. 58 at 346, Doc. # 22-2; Pl. Ex. 59 at 354, Doc. # 22-2).  Plaintiff was placed on a Performance Improvement Plan on December 20, 2007, two months

_____

[6]  Defendant contends that the December 2007 Performance Improvement Plan, the January 2008 Letter of Concern and the March 2008 Proposed Demotion Letter are not sufficiently adverse to support a Title VII claim.  With respect to the Performance Improvement Plan and the Letter of Concern, Plaintiff has failed to exhaust his administrative remedies, and therefore summary judgment is granted as to those actions, as discussed infra.  With respect to the Proposed Demotion Letter, Plaintiff does not contend that it is independently actionable, only that it "formed the necessary 'paper trail' created by Defendant to establish a pretextual justification for the clearly actionable employment decisions that followed."  (Doc. # 17 at 10).

1   before Reyes was placed on a Performance Improvement Plan.  (Pacoma Decl. ¶¶ 10-11, Doc.

2   # 15-2).

3        "Individuals are similarly situated when they have similar jobs and display similar

4   conduct.  The employees need not be identical; they must simply be similar in all material

5   respects." *Nicholson*, 580 F.3d at 1125 (quotations omitted).  Defendant contends that Reyes'

6   tolerance problems were not as severe or chronic as Plaintiff's problems.  However, viewing

7   all inferences in the light most favorable to Plaintiff, a reasonable jury could conclude that

8   Plaintiff and Reyes exhibited *similar* tolerance problems.  A reasonable jury could conclude

9   that Reyes was treated more favorably than Plaintiff because he was given two months longer

10  than Plaintiff to resolve his tolerance problems before being placed on a Performance

11  Improvement Plan.

12       Plaintiff has submitted evidence of the accountability reports for all commissaries in

13  Zone 16.  These reports show that numerous meat and produce departments in Zone 16 have

14  had problems staying in tolerance.  The 29 Palms Produce Department was out of cumulative

15  and monthly tolerance for 24 months during the 35 months between July 2007 and May 2010,

16  including losses of over $38,000 a month for each of the last three months.  (Pl. Ex. 59 at 355,

17  Doc. # 22-2; Pl. Ex. 60 at 363, Doc. # 22-2; Pl. Ex. 61 at 371, Doc. # 22-2).  The Yuma Marine

18  Corps Air Station Produce Department was out of cumulative and monthly tolerance for 16

19  consecutive months from March 2008 to June 2009, losing money each month.  (Pl. Ex. 60 at

20  363, Doc. # 22-2).  Woody, who is in charge of Zone 16, testified that "a lot of stores have

21  inventory variations," but to his knowledge, the only person who has been "disciplined ... for

22  inventory variation" is Plaintiff.  (Woody Dep. at 165-66, Pl. Ex. 22, Doc. # 17-3).

23       As Defendant correctly notes, Plaintiff has failed to submit evidence of potentially

24  relevant variables in the Zone 16 accountability reports, such as the races of the department

25  managers, the races of their managers, and whether the same department manager held that

26  position during the entire time the department was out of tolerance.  This failure lessens the

27  weight of the evidence, but it does not render it inadmissible to show the final element of a

28  prima facie case.  *See Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1476 (9th Cir. 1995)

1   (upholding the relevance and admissibility of statistical evidence that did not isolate all

2   potentially relevant variables–including the ages of the employees–in support of the fourth

3   element of the prima facie case of a disparate treatment age discrimination claim).

4        Viewing the evidence in the light most favorable to Plaintiff, the Court finds that the

5   Zone 16 accountability reports, in combination with Plaintiff's evidence related to Reyes'

6   tolerance problems, are sufficient to create a genuine issue of material fact as to whether

7   similarly situated individuals outside Plaintiff's protected class were treated more favorably.

8   *Cf. Dominguez-Curry*, 424 F.3d at 1037 ("At summary judgment, the degree of proof

9   necessary to establish a prima facie case is minimal and does not even need to rise to the level

10  of a preponderance of the evidence.") (quotation omitted).

11       The Court finds that Plaintiff has produced sufficient evidence to establish a prima facie

12  case under *McDonnell Douglas*.

13                    **b.      Legitimate, Nondiscriminatory Reason**

14       There is no dispute that Defendant has articulated a legitimate, nondiscriminatory

15  reason for demoting Plaintiff: Plaintiff's department was repeatedly out of tolerance.

16  According to the memorandum announcing Plaintiff's proposed demotion, Plaintiff was

17  demoted for being out of monthly tolerance during the periods of July 2007 through September

18  2007 and November 2007 through February 2008, and out of cumulative tolerance during the

19  period of August 2007 through February 2008.  (Def. Ex. 46 at NOL_336-337, Doc. # 15-5).

20  The proposed demotion memorandum also cites Plaintiff's failure to properly store and

21  package meat on February 26, 2008 and March 4, 2008.  However, Barcelona–who issued the

22  actual demotion decision–testified that "the only reason" he demoted Plaintiff "was that the

23  meat department was not within appropriate inventory tolerance." (Barcelona Dep. at 173, Pl.

24  Ex. 53, Doc. # 17-5).  Accordingly, the Court finds that there is an issue of fact as to whether

25  Plaintiff's alleged failure to properly store and package meat was a basis for Plaintiff's

26  demotion.  Viewing all inferences in the light most favorable to Plaintiff, the sole basis for the

27  demotion that the Court will consider on summary judgment is Plaintiff's failure to keep his

28  department in tolerance.

###### c.   Pretext

"At the third step of the *McDonnell Douglas* scheme, the plaintiff must show that the articulated reason is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Nicholson*, 580 F.3d at 1126-27 (quotation omitted).   "To avoid summary judgment at this step, however, the plaintiff must only demonstrate that there is a genuine dispute of material fact regarding pretext.   The amount of evidence required to do so is minimal." *Id*. at 1127.

Plaintiff contends that pretext is shown by the "memorandum of correction" issued by Vick less than a week after Plaintiff was demoted.   (Pl. Ex. 1 at 2, Doc. # 17-3).   In that memorandum, Vick stated: "The purpose of this memorandum is to provide corrected information in regards to our accountable inventory conducted on April 30, 2008. ...   Transfer sales amount of $24,591.11 from Grocery Department to Meat Department. ...   Pork Mini Ribs have been scanning to Grocery Department...." *Id*.

Barcelona–who issued the demotion decision–testified that he was not aware "some of the Meat Department stuff was being credited to another department." (Barcelona Dep. at 182, Pl. Ex. 42, Doc. # 17-5).   Barcelona also testified that if "some of the meat products were being credited to a different department instead of the Meat Department," that would affect his opinion of whether Plaintiff should have been subjected to discipline.   (*Id*. at 73-74).   Deaser, the human resources representative, testified that "at no point in time during the disciplinary process [of Plaintiff] did anybody [on] the commissary management team articulate that there was a problem scanning any specific product to the wrong department." (Deaser Dep. at 146-47, Pl. Ex. 43, Doc. # 17-5).   Deaser testified that this information "would be something to consider" as a mitigating factor.   (*Id*. at 146).   Woody, Vick's immediate supervisor, testified that he was not informed that (1) $24,591.11 was credited to the Meat Department shortly after Plaintiff was demoted; (2) the Meat Department was in cumulative tolerance on the day Plaintiff was demoted; and (3) a "loss ... was suffered when [DeCA] moved from the old store to the new store." (Woody Dep. at 146, Pl. Ex. 44, Doc. # 17-5; *see also id*. at 117-18, 121-23,

125).  Woody testified that he "would have liked to have seen those documents," and he "would expect [his] managers to keep [him] in the loop," but that "in some instances, I don't believe [Vick] did."  (*Id*. at 146).  Woody testified that the $24,591.11 "memorandum of correction" and the fact that the Meat Department was in cumulative tolerance on the day Plaintiff was demoted "should have been taken into consideration" prior to implementing discipline.  (*Id*. at 126).

This evidence creates an issue of fact as to whether the decisionmakers were informed of, and/or took into consideration, potentially favorable information to Plaintiff during the decisionmaking process.  This constitutes indirect evidence of pretext.  *See Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1152-53 (9th Cir. 2006) (evidence of pretext included the decisionmaker "ignor[ing] documents or parts of documents in the files that favored [plaintiff]"); *cf. Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1143 (9th Cir. 2001) (evidence of pretext included the decisionmaker making last-minute changes to the selection criteria which served to disadvantage the plaintiff in a discriminatory denial of promotion case).  Similarly, there is an issue of fact as to whether Vick took into account Plaintiff's written response to the proposed demotion, despite evidence that Plaintiff timely submitted it.  (Barcelona Dep. at 243, Def. Ex. 53, Doc. # 15-5 (Barcelona testified that he showed Plaintiff's written response to Vick, and Vick said "I'm not honoring that statement.").

Plaintiff's evidence creates an issue of fact as to whether any of the decisionmakers considered the *Douglas* factors prior to disciplining Plaintiff.  (Vick Dep. at 318, Pl. Ex. 25, Doc. # 17-4; Pacoma Dep. at 275, Pl. Ex. 45, Doc. # 17-5; Barcelona Dep. at 251-52, Pl. Ex. 46, Doc. # 17-6; Deaser Dep. at 138, Pl. Ex. 47, Doc. # 17-6).  Plaintiff also has created an issue of fact as to whether Defendant adhered to DeCA Directive 50-4, which provides a "penalty table" that states that a first offense for "failure to observe written regulations, orders, rules or procedures" should result in a "written reprimand to 1 day suspension."  (Pl. Ex. 20 at 93, Doc. # 17-3).  Although the "penalty table" is meant as a "guide" which "should not be applied mechanically," "[w]hen the action taken exceeds the standard table of penalties an

- 24 -

1   explanation for exceeding the table of penalties should be provided in the proposed notice of

2   disciplinary action." (*Id.* at 82-83).  This evidence supports an inference of pretext.  *See Porter*

3   *v. Cal. Dep't of Corr.*, 419 F.3d 885, 896 (9th Cir. 2005) (holding that "deviations from

4   [defendant's] protocols support an inference of pretext").

5        Plaintiff has presented evidence that, after Plaintiff was demoted and transferred, the

6   San Diego Commissary has had no African-American managers.  (Pacoma Dep. at 43, Pl. Ex.

7   56, Doc. # 17-6).  This constitutes evidence of pretext, *see Bergene*, 272 F.3d at 1143 (holding

8   that the absence of "women supervisors at the Coronado Generating Station..., apart from

9   human resources personnel" constitutes circumstantial evidence of pretext in gender

10  discrimination case), but because there are only a handful of supervisors at the San Diego

11  Commissary, the Court does not give this evidence significant weight.  *See Aragon*, 292 F.3d

12  at 663 ("[T]he fact that three of the four casuals singled out for lay off that night were white

13  could constitute circumstantial evidence of discrimination demonstrating pretext. Yet, because

14  the sample size is so small, we decline to give it much weight.").

15       Viewing Plaintiff's evidence of pretext cumulatively, the Court concludes that Plaintiff

16  has produced the "minimal" evidence necessary to "demonstrate that there is a genuine dispute

17  of material fact regarding pretext."  *Nicholson*, 580 F.3d at 1127; *see also Noyes v. Kelly*

18  *Servs.*, 488 F.3d 1163, 1170 (9th Cir. 2007) ("All of the evidence as to pretext ... is to be

19  considered cumulatively."); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004)

20  ("We have held that very little evidence is necessary to raise a genuine issue of fact regarding

21  an employer's motive....  When the evidence ... consists of more than the *McDonnell Douglas*

22  presumption, a factual question will almost always exist with respect to any claim of a

23  nondiscriminatory reason.") (quotation omitted).

24       The Motion for Summary Judgment as to Plaintiff's Title VII discrimination claim

25  related to his demotion is denied.

26            **2.   Exhaustion**

27       "In order to bring a Title VII claim in district court, a plaintiff must first exhaust her

28  administrative remedies." *Sommatino v. U.S.*, 255 F.3d 704, 707-08 (9th Cir. 2001) (citing 42

U.S.C. § 2000e-16(c)).  "Under the Title VII statutory and regulatory scheme, a federal employee must notify an EEO counselor of discriminatory conduct within 45 days of the alleged conduct, and then, if the matter is not resolved, the employee may submit a formal administrative complaint." *Id.* at 708 (citing 29 C.F.R. § 1614.105 (pre-complaint processing); 29 C.F.R. § 1614.106 (individual complaints)).  This "time limit is treated as a statute of limitations for filing suit and is subject to waiver, equitable tolling, and estoppel.  Failure to bring a grievance within the [forty-five day] statute can be fatal to a federal employee's discrimination claim." *Johnson v. U.S. Treasury Dep't.*, 27 F.3d 415, 416 (9th Cir. 1994) (citation omitted).

It is undisputed that Plaintiff first contacted an EEO counselor on May 8, 2008.  (Pl. Ex. 27 at 142, Doc. # 17-4).  Accordingly, Plaintiff failed to timely exhaust his administrative remedies as to any discrete act occurring before March 21, 2008, which was forty-five days earlier.  This includes the December 2007 Performance Improvement Plan (which ended in February 2008) and the January 2008 Letter of Concern.  Plaintiff does not contend that the doctrines of waiver, equitable tolling, and/or estoppel are applicable.[7]  Accordingly, the Motion for Summary Judgment as to Plaintiff's Title VII discrimination claims related to the December 2007 Performance Improvement Plan and the January 2008 Letter of Concern is granted.

### C.    Evidentiary Objections

Plaintiff's objections and/or requests to strike evidentiary materials cited in this Order are denied.  Plaintiff's objections and/or requests to strike evidentiary materials not cited in this Order are denied as moot.

### D.    Title VII Retaliation Claim

Title VII prohibits retaliation against an employee for opposing unlawful discrimination.  *See* 42 U.S.C. § 2000e-3(a).  "To establish a prima facie case of retaliation under Title VII, [the plaintiff] must show (1) that he acted to protect his Title VII rights; (2)

---

[7] Plaintiff contends that "evidence of the 12/07 PIP and the 1/08 Letter of Concern is admissible to demonstrate the wrongful motive of the Defendants."  (Doc. # 17 at 9).  Issues related to the admissibility of evidence may be raised in a motion in limine prior to trial.

that an adverse employment action was thereafter taken against him; and (3) that a causal link existed between the two events." *McGinest*, 360 F.3d at 1124 (citation omitted). "If [the plaintiff] has asserted a prima facie case of retaliation, the burden shifts to [the employer] to articulate a legitimate, non-discriminatory reason for the adverse employment action. If [the employer] articulates such a reason, [the plaintiff] bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." *Manatt v. Bank of Am., N.A.*, 339 F.3d 792, 800 (9th Cir. 2003) (quotation omitted).

Plaintiff contends:

> The Plaintiff has proffered substantial evidence to the effect that the draconian reduction in his pay, effected subsequent to the filing of his EEO complaint, was wrongful and substantial, and would clearly deter a reasonable person from filing a charge of discrimination. The Plaintiff has also proffered substantial evidence to the effect that a wrongful motive was more likely than not a motivating factor in the action. In this regard, Plaintiff was told, on several occasions, by multiple managers that he would have 'safe pay,' despite the demotion. Those individuals include Jackie Deaser, the Human Resources Specialist, Dave Woody, and Kevin Hennely, the DeCA counselor. He did, in fact, receive safe pay through August, 2008 when his pay was retroactively cut. Additionally, DeCA sought reimbursement.

(Doc. # 17 at 14 (citations omitted)).

### 1.   Prima Facie Case

It is undisputed that the first two elements of a prima facie case of retaliation has been satisfied with respect to Plaintiff's pay reduction. The parties dispute whether Plaintiff has established an issue of fact as to whether there is a causal link between Plaintiff's EEO activity and his reduction in pay.

"[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (citations omitted). "[W]hen adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred." *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000) ("Moreover, we have held that evidence based on timing can be sufficient to let the issue go to the jury, even in the face of alternative reasons proffered by the defendant."); *see also Miller v. Fairchild Indus.*, 885 F.2d 498, 505 (9th Cir. 1989) (prima

1  facie case of causation was established when discharges occurred forty-two and fifty-nine days

2  after EEOC hearings); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (sufficient

3  evidence existed where adverse actions occurred less than three months after complaint filed,

4  two weeks after charge first investigated, and less than two months after investigation ended).

5      On April 29, 2008, Plaintiff was demoted, and this decision was reaffirmed on May 2,

6  2008.  (Def. Ex. 48 at NOL_340, Doc. # 15-5; Def. Ex. 49 at NOL_342, Doc. # 15-5).

7  Plaintiff has produced evidence that, at the time of his demotion, Barcelona, Woody and

8  Deaser expected Plaintiff's pay to be unaffected by the demotion.  (Jeffries Dep. at 327-28, Pl.

9  Ex. 30, Doc. # 17-4; Woody Dep. at 130, Pl. Ex. 51, Doc. # 17-6).

10     Approximately one week after Plaintiff's demotion, on May 8, 2008, Plaintiff initiated

11  a complaint with the DeCA EEO office, alleging racial discrimination.  (Pl. Ex. 27 at 142, Doc.

12  # 17-4).  On May 9, 2008, Vick received an e-mail from an EEO counselor regarding

13  Plaintiff's charge of discrimination.  (Pl. Ex. 17 at 70, Doc. # 17-3).  The same day, Vick

14  forwarded the e-mail to Woody and Deaser.  *Id.*

15     The "request for personnel action" requesting Plaintiff be "change[d] to a lower [pay]

16  grade" was initiated on May 15, 2008 and completed on June 4, 2008.  (Def. Ex. 51 at

17  NOL_352, Doc. # 15-5).  The "request for personnel action" has a space for the name of the

18  official requesting the change, but the space was left blank.  *Id.*  However, Woody testified that

19  Deaser is the human resources "personnel specialist" who was handling Plaintiff's demotion

20  and who "is supposed to know about" whether Plaintiff's pay would be reduced because of the

21  demotion.  (Woody Dep. at 132, Pl. Ex. 51, Doc. # 17-6).

22     Plaintiff has produced sufficient evidence for a jury to find that, prior to Plaintiff's EEO

23  activity, Deaser stated that Plaintiff's pay would be unaffected by the demotion, but a week

24  after Deaser learned that Plaintiff initiated his EEO activity, an unnamed personnel official

25  initiated the request for Plaintiff's pay to be reduced.  Viewing all inferences in the light most

26  favorable to Plaintiff, this evidence creates an issue of fact as to whether there is a causal link

27  between Plaintiff's EEO activity and his reduction in pay.  *See Villiarimo*, 281 F.3d at 1065.

28          **2.    Legitimate, Nondiscriminatory Reason**

Defendant has articulated a legitimate, nondiscriminatory reason for the adverse employment action: Plaintiff's reduction in pay was a nondiscretionary consequence of Plaintiff's demotion.  (Doc. # 15-1 at 18).  The safe pay provision applicable to Plaintiff provides that, "[f]or internal placement actions which constitute a change to a lower grade ... pay will be set at the step which equals or exceeds the highest previous rate unless ... the action is for performance or disciplinary reasons."  (DeCA Directive 50-26, App. G ¶ G-3, Def. Ex. 15 at NOL_214; *cf.* 5 C.F.R. § 9901.355(b)(4) (safe pay not applicable "when an employee is involuntarily placed in a position in a lower pay band for unacceptable performance and/or conduct")).

### 3.    Pretext

Plaintiff has produced evidence that, prior to Plaintiff's EEO activity, Deaser told Woody that Plaintiff's pay would not be reduced because of the demotion.  (Woody Dep. at 130, Pl. Ex. 51, Doc. # 17-6).  Viewing all inferences in the light most favorable to Plaintiff, this statement from Defendant's "personnel specialist," *id.* at 132, is sufficient to create an issue of fact as to whether Defendant had the discretion to leave Plaintiff's pay unaffected by the demotion.  This evidence is sufficient to create an issue of fact as to whether Defendant's proffered explanation for the pay reduction–that it was nondiscretionary–"is unworthy of credence," and therefore pretextual.  *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003).

Accordingly, the Motion for Summary Judgment as to Plaintiff's Title VII retaliation claim is denied.

### E.    CSRA Claim

Defendant contends that "this Court lacks jurisdiction over Plaintiff's CSRA claim" because "Plaintiff has waived his CSRA claim by bypassing the [Merit Systems Protection Board] in favor of the district court."  (Doc. # 15-1 at 19, 25).

A "mixed case" complaint "is a complaint of employment discrimination filed with a federal agency based on race ... related to or stemming from an action that can be appealed to the Merit Systems Protection Board (MSPB)."  29 C.F.R. § 1614.302(a)(1).  A "mixed case"

complaint may be filed with the employer-agency's EEO process (pursuant to 29 C.F.R. § 1614.302) or with the MSPB (pursuant to 5 C.F.R. § 1201.151), but not with both.  *See* 29 C.F.R. § 1614.302(b).  If the "mixed case" complaint is filed with the federal agency's EEO process and a final agency decision is not issued within 120 days of the date of filing, "the complainant may appeal the matter to the MSPB at any time thereafter as specified at 5 C.F.R. 1201.154(b)(2) or may file a civil action as specified at § 1614.310(g), but not both."  29 C.F.R. § 1614.302(d)(1)(i); *see also* 29 C.F.R. § 1614.310(g) ("An individual who has a complaint processed pursuant to ... this subpart is authorized by 5 U.S.C. 7702 to file a civil action in an appropriate United States District Court: ... (g) After 120 days from the date of filing a formal complaint if there is no final action or appeal to the MSPB....").  Section 7702 of Title 5 of the United States Code provides:

> [I]f at any time after ... the 120th day following the filing of any matter ... with an agency, there is no judicially reviewable action ... an employee shall be entitled to file a civil action *to the same extent and in the same manner as* provided in section 717(c) of the Civil Rights Act of 1964 (42 U.S.C. 2000e-16(c)) ....

5 U.S.C. § 7702(e)(1)(A) (emphasis added).

Plaintiff filed an EEO complaint with Defendant on June 1, 2008.  (Def. Ex. 50 at NOL_344, Doc. # 15-5).  After waiting over 120 days, and before Defendant issued a decision on the EEO complaint, Plaintiff filed the Complaint in this Court on March 20, 2009.  (Compl. ¶¶ 6-7, Doc. # 1).  The parties agree that this situation is governed by 5 U.S.C. § 7702(e)(1)(A), but the parties dispute whether this Court has jurisdiction over Plaintiff's Title VII claims alone, or whether this Court also has jurisdiction over Plaintiff's CSRA claim.

The majority of courts to have addressed this issue have held that the language of 5 U.S.C. § 7702(e)(1)(A) stating "to the same extent and in the same manner as provided in [Title VII]," does not limit the district court's jurisdiction to only those claims arising under Title VII.  *See Ikossi v. Dep't of the Navy*, 516 F.3d 1037, 1041 (D.C. Cir. 2008) ("The plain text of the concluding clause of section 7702(e)(1)–'to the same extent and in the same manner as provided in section 717(c) of the Civil Rights Act of 1964...'–demonstrates that it is not a limitation on the type of claims that may be pursued.... The ... referenced statutory provision[]

1   [is] procedural in nature....  Thus, the concluding clause of section 7702(e)(1) merely specifies

2   the procedure that governs mixed cases....") (holding that the district court had jurisdiction

3   over the CSRA claims in addition to the discrimination claims when the agency failed to issue

4   a decision within 120 days); *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 472 (6th Cir. 2003)

5   ("[A] plaintiff may properly bring a mixed case complaint through an employer-agency's EEO

6   process, and then, if the agency takes no action within 120 days, bring the mixed case

7   complaint to the district court."); *Doyal v. Marsh*, 777 F.2d 1526, 1536 (11th Cir. 1985)

8   ("Congress, through this section [i.e., § 7702], has explicitly given the employee certain rights

9   and options, one of which is to file a civil action based on his mixed case complaint before

10   resorting to the MSPB."); *but see Bonds v. Leavitt*, 647 F. Supp. 2d 541, 580 (D. Md. 2009)

11   ("It is undisputed that cases arising only under the CSRA proceed to the MSPB and a record

12   is created to permit further review in either the Federal Circuit or a federal district court.  Yet,

13   under the reasoning of *Ikossi*, *Seay*, and *Doyal*, a different procedure would apply to cases

14   initiated at the agency through the EEO process that had not been decided in 120 days; those

15   cases suggest that nondiscrimination claims (e.g. ... CSRA) should be permitted to proceed to

16   a federal district court absent the MSPB record.  However, this approach undermines the

17   efficacy and desirability of record review of CSRA decisions, and it appears inconsistent to

18   permit some claims to come to the court based upon a review of the record while others would

19   receive de novo review.").  The majority "holding ... reflects the legislative history, which

20   states that 'questions of the employee's inefficiency or misconduct, and discrimination by the

21   employer, are two sides of the same question and must be considered together.'" *Ikossi*, 516

22   F.3d at 1037 (quoting, inter alia, *Doyal*, 777 F.2d at 1537).  In a different context, the Ninth

23   Circuit has relied upon this principle: "Every circuit considering the issue of proper treatment

24   of CSRA cases alleging a colorable racial discrimination claim has refused to approve

25   bifurcation [of discrimination claims and CSRA claims]. ... [T]he legislative history of the

26   CSRA, considerations of judicial economy, and the interests of the litigant all weigh against

27   bifurcation." *Tolliver v. Deniro*, 790 F.2d 1394, 1396 (9th Cir. 1986) (citing, inter alia, *Doyal*,

28   777 F.2d at 1536-37).

1    The Court finds the reasoning of the majority position to be most consistent with the

2  language of 5 U.S.C. § 7702(e)(1) and the intent of Congress.  The Court concludes that it has

3  jurisdiction over Plaintiff's CSRA claim.  The Motion for Summary Judgment as to Plaintiff's

4  CSRA claim is denied.

5  **V.      Conclusion**

6    IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is granted

7  in part and denied in part.  (Doc. # 15).  The Motion for Summary Judgment is granted as to

8  Plaintiff's Title VII discrimination claims related to the December 2007 Performance

9  Improvement Plan and the January 2008 Letter of Concern.   The Motion for Summary

10 Judgment is denied in all other respects.  Plaintiff's request to strike evidentiary materials

11 submitted by Defendant is denied.  (Doc. # 17-2, 18).

12    No later than fourteen (14) days from the date this Order is filed, the parties shall

13 contact the chambers of the Magistrate Judge to schedule a case management conference

14 regarding the status of discovery and to schedule a new final pretrial conference date.

15 DATED:  August 31, 2010

16
                      *William Q. Hayes*
                      **WILLIAM Q. HAYES**
17                    United States District Judge